Filed 01/08/24

## STATE OF VERMONT

**SUPERIOR COURT**
**ADDISON UNIT**

**CIVIL DIVISION**
**Docket No. 72-4-20 Ancv**

**AERIE POINT HOLDINGS, LLC,**
**Plaintiff,**

v.

**VORSTEVELD FARM, LLP,**
**Defendant**

### Decision:
### Motion to Find Defendant in Contempt of Court
### and to Enforce August 15, 2022 Judgment (Motion # 20)

This is a post judgment motion in which Plaintiff seeks sanctions for contempt and enforcement of an injunctive judgment. An evidentiary hearing was held on December 11, 12, and 14, 2023. Vicki Hopper was present on behalf of Plaintiff Aerie Point Holdings LLC, which was represented by Attorney Merrill E. Bent. Hans Vorsteveld and Gerard Vorsteveld were present on behalf of Defendant Vorsteveld Farm LLC, which was represented by Attorney Claudine C. Safar.

Based on the evidence, the court makes the following Findings of Fact, Conclusions of Law, and Order.

### Findings of Fact

On March 28, 2022, after a multi-day court trial, this court issued a Decision in which it found and concluded that Defendant Vorsteveld Farm LLC (hereinafter "Farm") had committed trespass and nuisance against the land of its downslope neighbor Plaintiff (hereinafter "Aerie Point") by increasing the volume and velocity of water discharged into two streams that crossed Aerie Point land. This occurred as a result of the installation of an extensive tile drainage system on the Farm's farmland, the discharge occurring in a manner that caused damage in a number of ways including erosion of land and deposits of sediment and phosphorous. Aerie Point sought only injunctive relief to stop the ongoing damage from the effects of the increased volume and velocity of the water and the particles it carried.

On May 16, 2022, following the Decision and in preparation for a judgment, the court issued an entry order with proposed language for the portion of the injunctive judgment related to water, and thereafter provided multiple opportunities for input from the parties on the terms of the injunctive order. No objections were raised or alternatives proposed.

1

On August 15, 2022, the Judgment issued with language unchanged from the proposal:

Defendant is enjoined from allowing water, and any particles it carries, from flowing from the discharge points of Defendant's drain tile system into the public ditches and culverts westerly of Defendant's land on Arnold Bay Road between Adams Ferry Road and Pease Road.

No timely appeal was filed. The Order became final on September 15, 2022. The Farm filed a motion for a late appeal without requesting a stay of the injunction per V.R.A.P. Rule 8. The motion for a late appeal was denied by the Vermont Supreme Court on April 7, 2023.

On June 5, 2023, Aerie Point filed the "Motion to Find Defendant in Contempt of Court and to Enforce August 15, 2022 Judgment" that is now before the court.

The original trial in the case took place in January of 2022. Prior to its conclusion, the federal Environmental Protection Agency had begun an investigation into a possible wetlands violation on a portion of the Farm's land. The evidence at trial did not include information about this investigation. In May of 2022, during the period after the Decision in this case and before the Judgment, Defendant hired Mark Bannon of Bannon Engineering, an expert in soil and water engineering, to observe soil sampling done by the EPA, and he became involved on behalf of the Farm in what became an EPA investigation and enforcement action. In November of 2022, he conducted an extensive study on behalf of the Farm in relation to the EPA investigation. He was not engaged to do any work on behalf of the Farm to pursue compliance with the Injunction, although the Judgment had become final.

There is no credible evidence that the Farm undertook any specific action to pursue compliance with the Injunction from the time it was issued through the period that the late-filed motion to appeal was pending. It had not sought to stay the injunction. Vicki Hopper of Aerie Point spent time on the property in December of 2022 and saw no changes to the manner in which water was discharged onto Aerie Point land. In January of 2023, the Farm spent $700,000 to purchase 200 acres of additional farmland. There is no evidence that the purpose of the purchase was related to any effort to reduce or stop the damage to Aerie Point land.

At some point, Mark Bannon, who was working on the EPA enforcement action, became aware of the Injunction, but was not engaged to do anything about it. In March of 2023, Dori Barton, an ecological consultant specializing in wetlands projects, first visited the Farm's land in connection with the EPA enforcement action and drafted a mitigation proposal on behalf of the Farm. She became aware of the Injunction but was not engaged to become involved in compliance efforts. On April 7, 2023, the Farm's late-filed request to appeal was denied by the Vermont Supreme Court. At that point there was nothing pending in court that could potentially change the Farm's obligation to comply with the Injunction.

From April of 2023 continuously to the hearing in December of 2023, Vicki Hopper resided at Aerie Point and saw no changes in the volume or velocity of water flowing in the two streams from the Farm's upslope land through the two culverts and across Aerie Point land. The water coming through those culverts continued to be brown and foamy and flow in the same velocity and volume as described in the Findings of Fact from the trial.

In May of 2023, EPA representatives visited the Farm in pursuit of wetlands enforcement. Hans and Gerard Vorsteveld, owners and operators of the Farm, cooperated with the EPA and engaged Mr. Bannon and Ms. Barton to do so on their behalf. The work did not include compliance with the Injunction.

In June of 2023, Aerie Point filed this Motion for Contempt and Enforcement. Two months later, on August 11, 2023, the Farm filed a Motion for Relief from the Injunction under Rule 60(b)(5) claiming that it was no longer equitable that the judgment should have prospective application. This court denied the Motion for Relief, and an appeal is currently pending before the Vermont Supreme Court.

In the meantime, in July of 2023, this court ruled that an evidentiary hearing would be held on the Motion for Contempt and Enforcement. That month, Dr. Joshua Faulkner, an agricultural hydrologist and Director of the Environmental Testing Laboratory at the University of Vermont, was contacted by the Farm and began to work on a modified design of a flow regulator to slow the flow of the water coming out of the tile drain discharge points. Flow regulators are used on flat farmland in the Midwest. He sought to adapt the design to the Farm's sloping land. His involvement is as a researcher without charge to the Farm. In late October he installed an experimental flow regulator at one of the 15-16 discharge outlets from the tile drainage system. There is no data from this experiment yet, and he estimates that it will take at least a year to obtain results. He acknowledged that any effect could only affect a portion of the tiled farm fields because of the grade of the sloping land. It is premature to know whether the use of this innovative experimental device will be able to slow the volume and velocity of water runoff from the tile drain system or to what degree. The current installation is an experiment only and on its own is not likely to be sufficient to prevent continued erosion and deposits of sediment and phosphorous on Aerie Point land.

At some point no sooner than late August, Mr. Bannon was apparently engaged to begin efforts to address the requirements of the Injunction. Until then, all his billing reflects work on only the EPA action. The bill dated November 1, 2023 indicates some work performed related to "Hoppers" (Aerie Point) for the first time. There is no evidence that Dori Barton was asked to address Injunction issues until shortly before the December hearing.

Although Hans and Gerard Vorsteveld testified in general terms that other efforts were made, the evidence was vague. It does not show when such efforts occurred or provide specific information. Hans Vorsteveld testified that he 'walked around and talked with different folks' about what to do, but gave no more information than that about when

3

or with whom or about what. The Farm apparently installed one more discharge outlet to the tile drain system, although the timing, purpose, and effect is unknown, and it planted a buffer strip along the lower edge of a field, although there was no evidence about when or why that occurred or that it has had any mitigating effect. There is no evidence that either of these would be effective remedies for the harm the Injunction is designed to prevent.

The owners and operators knew that there was a court order and what it required. Hans Vorsteveld stated in an affidavit, "I am aware of this court's August 2022 order that requires Vorsteveld Farm. . .to prevent water from our tile drains from reaching the ditch along Arnold Bay Road." Gerald Vorsteveld testified that he understood that the Injunction meant that the Farm 'can't let tile water go into ditches and culverts.'

The Farm did not undertake any serious consideration of the possibility of capturing the water at the discharge outlets from the tile drain system and diverting it for disposal, sale, or alternative uses. Hans Vorsteveld testified only in general terms that trucking water away would take 'a lot of trucks and a lot of traffic,' Gerard Vorsteveld testified that it would take 'a lot of trucks' and also that it would be expensive and noisy; that they wouldn't know where to dump the water, and they "assume" that the Hoppers wouldn't like the noise and traffic. On cross examination, he acknowledged that he did not have actual figures for the cost of trucking. When asked what he thought trucking would cost, he made a generalized estimate that 1 inch of rain over 250 acres would generate 7 million gallons of water that would require 1000 truckloads. In the affidavit of Hans Vorsteveld dated July 3, 2023 (Exhibit A), he estimated 750 truckloads, and without actual cost figures, concluded that due to cost, trucking water away would be too expensive. The Farm did not seriously investigate options for diverting water from the discharge outlets in other ways or for other uses.

Shortly before the hearing started on December 11, 2023, Mr. Bannon developed a proposal that addresses the EPA wetlands mitigation project but also includes a plan for dispersing the water from the tile drain discharge outlets to multiple locations throughout the Farm acreage with numerous installations designed to slow the velocity and volume of the water and divert some of it to repair the wetlands that are the subject of the EPA project. Additionally, some of the water would also be used to create a new wetlands area. The plan, dated December 3, 2023 (approximately one week before the hearing), is shown on the maps in Exhibit G. Mr. Bannon explained it in testimony.

On December 7, 2023, four days before the hearing, the Farm obtained an estimate that it would cost $10,000 per acre to remove and dispose of the tile drains. The total cost would be $2.5-3 million dollars.[1] The hydrology experts, Mr. Bannon, Dr. Faulkner, and Dr. Van Es, all testified that removing the tile drains altogether or plugging them up could result in negative effects to soil and water on the lands of both parties. The Injunction does not require removal or cessation of the use of the drain tiles. It merely prohibits disposal of the discharges from it onto Aerie Point land.

---

[1] The $3 million estimate based on evidence is for 300 acres. However, Hans Vorsteveld has stated that approximately 250 acres are related to the terms of the injunction. Exhibit A and testimony related to trucking.

Photographs taken the first day of trial show that the concentrated flows from the Farm's tile drain system crossing the ditch on Arnold Bay Road and coming through the culverts and flowing through Aerie Point land in the northern and southern streambeds continue to be brown in color, significant in volume and velocity, and continue to cause erosion, including at a new location in the side of the northern streambed.

Vicki Hopper heard about the Bannon plan for the first time during the hearing and is interested in learning more about its possibilities for addressing the problems currently causing damage to Aerie Point land.

During a break in the hearing for discussion between the parties, they agreed to continue to communicate about the details of this new proposal and to attend mediation within 60 days. The EPA mitigation project is moving forward toward implementation in the spring of 2024. The parties intend to use the upcoming weeks to explore whether the Bannon plan may provide a framework for not only successfully addressing the EPA enforcement action but also providing a solution for preventing further injury to Aerie Point land.[2]

Dori Barton, who does stream assessments and manages large wetlands projects, testified that the tile drain outlets currently drain into the two existing streambeds, and that it would be advisable to isolate and divert the outflow from the discharge outlets upstream, close to the discharge outlets rather than near the ditch and culverts on Arnold Bay Road. This is consistent with the Bannon plan. She is enthusiastic about working on a plan that addresses both the EPA mitigation project and injunction compliance because wetlands creation also has benefits for Lake Champlain. Although her work so far has been focused on the EPA project, more recently it has begun to include injunction compliance on behalf of the Farm. Her map of streambeds is dated December 8, 2023, three days before the contempt/enforcement hearing.

Defendants claim that they are in compliance with the Injunction because they do not discharge water from the tile drain outlets directly into the ditch alongside Arnold Bay Road. However, the water from the tile drain outlets drains into the two streambeds, which carry it to the ditch and through the culverts under Arnold Bay Road in such a manner that its volume and velocity as it moves through the streambeds to Lake Champlain on Aerie Point land cause the harm described in the Decision. It is the harmful effect of the increased volume and velocity of the water as it rushes downslope and through or across the ditch and into the culvert and onto Aerie Point land, causing erosion and carrying sediment and phosphorous, that is prohibited from continuing and that has not been addressed.

---

[2] As written in a motion ruling issued September 21, 2023, the court understands that there may be alternative means of achieving the objective of the Injunction, and an amendment to the Injunction may become appropriate if there are specific facts to support the feasibility of such a plan. Order: Motion for Relief from Judgment (Motion #24), September 21, 2023, pp 5-6.

Before judgment, Defendant Farm quite appropriately asked the court to make the injunction specific to enable it to have a standard by which compliance could be measured. The terms of the Injunction use the ditch as a boundary such that the Farm is free to manage the water discharged from the tile drain outlets as it chooses on its own property all the way to the ditch line. It is not free to dispose of the tile discharge water by releasing it such that it moves through the ditch and culverts and onto Aerie Point land. It is disingenuous for the Farm to claim that it is not in violation of the Injunction because of a technical argument that the water travels to the ditchline via streambeds rather than directly from the discharge outlets into the ditch.

In sum, the evidence is clear and convincing that:
- the Injunction was issued on August 15, 2022
- Defendant's owners and operators had had knowledge of its proposed terms four months earlier than that
- it required reparative action on the part of the Farm and was specific about what would constitute compliance
- the owners and operators of the Defendant Farm had knowledge of the Order and what it required
- they had the ability to engage experts and pursue methods for compliance, as shown by the manner in which they did so with respect to the EPA enforcement action
- they took no meaningful action to pursue compliance until after Plaintiff's Motion for Contempt and Enforcement was filed (June 2023), determined to be scheduled for hearing (July 2023), and scheduled for hearing (September 2023), and even then they did not begin to develop compliance plans until the hearing was imminent (December 2023)
- the steps taken so far toward compliance are only preliminary and would not have occurred at all without the filing of the Motion for Contempt and Enforcement and a court hearing on the motion.

The court also finds by a preponderance of the evidence that the Farm has now engaged their experts Mark Bannon and Dori Barton to work on a promising plan to comply with the purpose of the Injunction in conjunction with implementation of the EPA wetlands mitigation project.

**Conclusions of Law**

Plaintiff seeks a finding of contempt, an award of attorneys' fees, and coercive sanctions to enforce compliance and prevent ongoing damage to Aerie Point land.

Defendant claims that it is not in violation of the Injunction, or alternatively that compliance is impossible, or alternatively that it has taken reasonable steps toward compliance.

Proceedings for contempt and enforcement of a court order are authorized by statute. 12 V.S.A. § 122.  Plaintiff must show by clear and convincing evidence that there

6

was a court order that required specific action and that the Defendant had actual knowledge of it and failed to comply. *Vermont Women's Health Center v. Operation Rescue,* 159 Vt. 141, 146 (1992). Once a plaintiff has made such a showing, the burden shifts to the defendant to establish by clear and convincing evidence either that it has complied or that it has a defense to contempt, such as inability to comply. *Spabile v Hunt,* 134 Vt 332, 335 (1976). For an "inability to comply" defense, "[t]he defendant has the burden of proving impossibility of compliance with the order, as well as that it had diligently attempted to comply with it." *Socony Mobil Oil Co. v. Northern Oil Co.,* 126 Vt. 160, 165 (1966).

*Contempt*

As set forth above in the Findings of Fact, Plaintiff has shown by clear and convincing evidence that the Farm's owners and operators knew of the Injunction and knew that it required them to prevent the water from the tile drain discharge outlets from reaching the ditch on Arnold Bay Road where it would proceed through the northerly and southerly culverts under the road at a volume and velocity such that the water and the sediment and phosphorous it carried damaged Aerie Point land. The Farm did not seek a stay of the Injunction and it made no changes to the manner in which it disposed of discharged water from the drain tile system onto Aerie Point land. Plaintiff has met its initial burden.

Defendant Farm thus has the burden of proving by clear and convincing evidence either that it has complied or that it has a defense. It asserts compliance, impossibility, and effort at compliance.

It has not proved compliance by clear and convincing evidence. The water from the tile drain system continues without change to travel to and past the ditch and through the culverts in the northerly and southerly streambeds in amounts and with such force that it continues to cause damage by erosion. Furthermore, the brown color and foam in the water indicate that it continues to carry sediment and phosphorous on to Aerie Point land. Its argument that it is in compliance because the discharged water does not go directly into the ditch is not reasonable and does not show compliance. The ditch is a location marker to set a standard for compliance. The Farm's obligation is to keep the waste water from the tile drain system discharge outlets off Aerie Point land. Gerard Vorsteveld's testimony of his knowledge of the Injunction shows that he understood it correctly.

The Farm alternatively claims inability to comply. This has also not been proved by clear and convincing evidence, or even a preponderance of the evidence. Its evidence consists largely of its owners' opinion that removal of the tile drains or trucking the water away would be expensive, but it has not provided sufficient evidence of its financial condition to prove financial inability. During the period when it should have been working on compliance it did not do so but instead spent $700,000 to buy additional property. Even more telling is that in just a few days prior to the hearing, once it finally engaged its experts to pursue planning for compliance, they have been able to develop a plan in a short period of time that looks promising.

The inability defense "is effective only where, after using due diligence, the person is still not able to comply with the order." *Socony Mobil Oil Co. v. Northern Oil Co.,* 126 Vt. 160, 162 (1966) (citations omitted). A showing of diligent effort to comply is a prerequisite to presenting a defense of inability to comply. "In the absence of a showing of due diligence on the part of the defendant to comply with the order of the court, the [court] was not called upon to make a determination whether defendant was unable to obey the decree. . ." *Id.*

The Farm has not proved that it exercised due diligence in seeking to comply during the lengthy period preceding December 2023 when the hearing on this Motion became imminent. The facts show that it did nothing at all until July of 2023, over a year after it knew what the injunction would require. Even then, it did very little. There has been one experimental device installed at one of 15-16 outlets and its maximum potential impact can only be partial. Its possible contribution is yet unknown. It was not until the fall of 2023, after the hearing on this motion was scheduled, that the Farm finally engaged Mr. Bannon to work on an actual plan to comply with the Injunction, and the plan was only formulated a few days before the hearing. Defendant had the ability to pursue compliance, as shown by the steps it took with respect to the EPA enforcement action. At the same time that it pursued compliance with that action, it did nothing to seek to comply with the Injunction, resulting in ongoing damage to the Plaintiff's property. The December 11, 2023 photos indicate no improvement. In sum, the evidence does not show due diligence in seeking to comply.  On the contrary, the clear and convincing evidence is that no steps would have been taken at all if Plaintiff had not filed the motion and it had not been scheduled for hearing.

The court concludes that Defendant is in contempt for failure to comply with the Injunction.

*Sanctions*
The purpose of sanctions for civil contempt is not to punish but to obtain compliance with the court order when a complaining party has been deprived of a "right, benefit, or remedy to which he is entitled under an order of the court." *Obolensky v. Trombley*, 2015 VT 34, ¶ 42. The evidence shows that dialogue in pursuit of resolution opened between the parties during the last day of the hearing. The Farm has now introduced a plan, and the parties have agreed to go to mediation. They have identified four months as a reasonable period of time for trying to make cooperative progress on a plan. Therefore, the court declines to impose coercive sanctions at this time. The Motion for Contempt and Enforcement will remain pending.  A supplemental motion to impose coercive sanctions may be filed during that period if Defendant fails to undertake due diligence toward compliance. If no motion is filed, a status conference will be scheduled after May 6, 2024 to determine future action on this motion.

*Plaintiff's Request for Attorneys' Fees*
Parties are normally required to pay their own attorneys' fees under the American Rule, absent a statutory requirement or contractual obligation. There is an exception where "defendant's actions caused plaintiff to incur additional litigation expenses in order to protect her interests." *Appeal of Gadhue*, 149 Vt. 322, 330, 544 A.2d 1151, 1155 (1987). Attorneys' fees

may be awarded "in those exceptional cases where justice demands an award of attorney's fees, such as where a party is unjustly forced to endure a second round of litigation." *Agency of Nat. Res. v. Lyndonville Savings Bank & Tr. Co.*, 174 Vt. 498, (2002) (mem.) (citations omitted); *Sutton v. Purzycki*, 2022 VT 56, ¶ 63.

The court has found by clear and convincing evidence that Defendant would not have taken any meaningful steps toward compliance if Plaintiff had not filed this Motion for Contempt and Enforcement. Plaintiff had obtained a legal right to a specific remedy by court order. After nearly a year of noncompliance, it was forced to pursue a second round of litigation to enforce compliance. Thus Plaintiff is entitled to attorneys' fees in connection with this Motion.

However, in order to achieve the purpose of the Injunction, it does not make sense for the parties to devote time and attention to the issue of attorneys' fees during the next four months when their attention and resources should be devoted to resolution of the objective of the Injunction. Therefore, Plaintiff may not file a request for attorneys' fees prior to May 6, 2024. A request, supported by affidavit and time and billing records, may be filed after May 6, 2024 and no later than June 3, 2024. If such a request is filed, Defendant may file a response within 14 days, and the court will determine whether a hearing is warranted. Again, this Motion remains open pending resolution of the claim for attorneys' fees.

## Order

Based on the foregoing,
1. Defendant is found in contempt of court;
2. Plaintiff is entitled to attorneys' fees in connection with this Motion; any request must be filed no sooner than May 6, 2024 and no later than June 3, 2024 and must be supported as described above;
3. This Motion for Contempt and Enforcement remains pending;
4. Plaintiff may file a supplemental motion for coercive sanctions, supported by specific facts, during the pendency of this Motion if warranted by failure on the part of Defendant to exercise due diligence toward compliance; and
5. A status conference will be scheduled to take place after May 6, 2024.

Electronically signed January 5, 2024 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned

9